P.R. FARMS, INC., ET AL., 1 Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent P. R. Farms, Inc. v. CommissionerDocket Nos. 5617-78, 12046-81, 5618-78, 12047-81, 799-81, 12048-81.United States Tax CourtT.C. Memo 1984-549; 1984 Tax Ct. Memo LEXIS 123; 48 T.C.M. (CCH) 1379; T.C.M. (RIA) 84549; 60 A.F.T.R.2d (RIA) 5052; October 15, 1984. *123 H and W, petitioners, owned over 90 percent of the stock in petitioner P.R. Farms, a corporation engaged in the farming of fruit. H also owned 50 percent of the stock in corporation G.F.S. Petitioner corporation Palomate was equally owned by H and W's four children. Held, G.F.S. was the agent of P.R. Farms. Held further, the interest income earned by G.F.S. is taxable to P.R. Farms. Held further, the net sales proceeds of P.R. Farms' fruit reported by Palomate are taxable to P.R. Farms. Held further, P.R. Farms may not deduct $16,810 as interest paid to Palomate. Held further,P.R. Farms' deduction for rent paid to Palomate allowed. Held further, amounts paid by P.R. Farms to H's son for cost of fruit purchased are nondeductible. Held further, amount of constructive dividends from P.R. Farms to H determined. Held further, various minor adjustments determined by respondent sustained. Held further, H and W and P.R. Farms are not liable for addition to tax for negligence. Sec. 6653(a), I.R.C. 1954. Lawrence V. Brookes and Valentine Brookes, for the petitioners. Rebecca T. Hill, for the respondent. NIMS MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: In these consolidated *124 cases, respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax: Docket No.PetitionerYearDeficiencySec. 6653(a) 2Addition to Tax5617-78P.R. Farms, Inc.1974$919,027.91$45,951.405618-78Pat Ricchiuti and197472,826.003,641.00Frances Ricchiuti799-81Palomate PackingFYE1,577.00Company, Inc.1/31/7712046-81P.R. Farms, Inc.1975309,947.0015,497.001976166,648.008,332.00197742,450.002,123.0012047-81Pat Ricchiuti and1975202,202.0010,110.00Frances Ricchiuti1976171,240.008,562.001977155,124.007,756.0012048-81Pat V. Ricchiuti19751,314.0019771,846.00After concessions and various amendments to the pleadings by the parties, the issues for decision are: (1) whether the proceeds received by General Fruit Sales, Inc. (G.F.S.) from the sales of fruit grown by P.R. Farms, Inc., (P.R. Farms) are includable in P.R. Farms' gross income in the taxable year that G.F.S. received the proceeds or in the following year when G.F.S. remitted the proceeds to P.R. *125 Farms; (2) whether the interest income earned by G.F.S. on the proceeds retained from the sales of P.R. Farms' fruit is includable in P.R. Farms' gross income; (3) whether the net proceeds reported by Palomate Packing Company, Inc. (Palomate) from the sales of fruit which it purchased from P.R. Farms are includable in P.R. Farms' gross income; (4) if the net sales proceeds reported by Palomate are includable in P.R. Farms' gross income, whether the proceeds are taxable to P.R. Farms in the year in which G.F.S. received payment for the fruit or in the following year when G.F.S. remitted the proceeds to Palomate; (5) whether P.R. Farms is entitled to deduct $16,810 as interest paid to Palomate in 1975; (6) whether P.R. Farms may deduct the portion of the rental payments made to Palomate which are attributable to commercially non-productive land; (7) whether P.R. Farms is entitled to deduct $16,964.50, $24,412, and $22,641 in 1974, 1975, and 1976, respectively, as the cost of fruit purchased from Pat V. Ricchiuti; (8) whether Pat Ricchiuti received a constructive dividend from P.R. Farms in connection with the following items: (a) the net proceeds retained by Palomate (issue 3); (b) *126 the interest paid by P.R. Farms to Palomate (issue 5); (c) the rent paid by P.R. Farms to Palomate (issue 6); (d) the amounts paid by P.R. Farms to Pat V. Ricchiuti for the cost of fruit purchased (issue 7); and (e) the interest income earned by G.F.S. (issue 2); (9) (a) whether P.R. Farms is entitled to deduct automobile and insurance expenses attributable to Mari Ann Ricchiuti's use of a 1971 Cadillac; (b) whether P.R. Farms properly substantiated under section 274 certain foreign travel expenses of Pat and Frances Ricchiuti; (c) whether Pat and Frances Ricchiuti received constructive dividends due to P.R. Farms' payment of various personal expenses; (d) whether Pat Ricchiuti is entitled to deduct depreciation attributable to his personal residence; (e) whether P.R. Farms is entitled to deduct $1,718.00, $1,388.40 and $511.00 of capital expenditures in 1975, 1976 and 1977; (f) whether P.R. Farms is entitled to deduct $1,514.00, $298.00 and $1,450.00 of Pat Ricchiuti's personal expenses in 1975, 1976 and 1977; (g) whether Mari Ann Ricchiuti used a Chevrolet Camaro for business purposes; (h) whether Palomate incurred a long-term capital gain in the amount of $2,142 due to the sale *127 of a parcel of land; (i) whether Palomate is entitled to a refund of an overpayment of tax in the amount of $95,668; (j) whether Pat V. Ricchiuti overroported farm income on his 1975 and 1977 income tax returns; (k) whether petitioners are liable for various other minor adjustments determined by respondent; and (10) whether petitioners P.R. Farms or Pat and Frances Ricchiuti are liable for the addition to tax for negligence or intentional disregard of rules and regulations under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Pat (Pat Sr.) and Frances (Frances) Ricchiuti, husband and wife, and Pat V. Ricchiuti (Pat Jr.), their son, resided at Clovis, California, at the time their respective petitions were filed. Petitioners P.R. Farms and Palomate are California corporations with their principal places of business at Clovis, California. P.R. Farms - BackgroundAfter receiving his discharge from the United States Army in 1946, Pat. Sr. returned to Clovis, California, to work on his father's 90-acre ranch. The ranch was planted with wine and *128 table grapes at that time and eventually became known as the Home Ranch. The Home Ranch was also known as P.R. Ranch No. 1. Pat Sr. became the sole owner of the Home Ranch in 1954. Shortly thereafter, he mortgaged the ranch to pay for a home which was built on the frontage of the property. The mortgage proceeds were also used to finance the construction of a packing shed which was located approximately 200 yards from the house. The packing shed was used for packing and storing peaches which had subsequently been planted on the Home Ranch. During the next few years, Pat Sr. acquired numerous parcels of farmland within the general vicinity of the Home Ranch. Approximately 280 acres of land were purchased by Pat Sr. and subsequently planted with grapes, apricots, nectarines, peaches and plums. Of the land acquired, 240 acres were contiguous and became known as P.R. Ranch No. 2. The remaining 40 acres eventually became known as P.R. Ranch No. 3. All of the fruit grown on these ranches were packed at the packing shed located on the Home Ranch. In 1963, Pat Sr. and Frances incorporated P.R. Farms.They contributed P.R. Ranch No. 2 and all of the ranch equipment to the corporation as *129 part of its capitalization. In addition, the Home Ranch (with the exception of their personal residence) and P.R. Ranch No. 3 were leased to P.R. Farms. Between 1964 and 1970 Pat Sr. arranged for the purchase of substantial additional amounts of farmland. The majority of these purchases were made by Pat Sr. as president of P.R. Farms although a fewparcels of land were bought by him personally. In 1964, P.R. Farms acquired a 180-acre parcel which became known as P.R. Ranch No. 5. P.R. Farms eventually planted the entire ranch with almonds. In 1965, P.R. Farms purchased 80 acres of land adjacent to the Home Ranch and planted apricots and nectarines on the land. P.R. Ranch No. 4 was purchased by P.R. Farms in 1967. The 310-acre parcel was eventually planted with nectarines, apricots, peaches and almonds. In 1968, Pat Sr. acquired a 250-acre parcel which became known as P.R. Ranch No. 7. This ranch was planted primarily with almonds. In 1969, P.R. Farms and Pat Sr. jointly purchased 335 acres of property which became known as the Big Six Ranch. A portion of the ranch was primarily planted with nectarines.The Big Six Ranch also contained a packing area considerably larger than the *130 packing shed located on the Home Ranch. Beginning with the 1970 harvest and until the years at issue, all fruit packing was done at the Big Six Ranch facility. The packing shed at the Home Ranch was converted to an equipment shelter. By the end of 1973, P.R. Farms owned or leased approximately 1,650 acres of farmland. General Fruit SalesIn 1965, P.R. Farms began to sell the majority of its fruit through Heggblade and Margolis (H&M), a licensed fruit seller which acted as P.R. Farms' agent on a commission basis. Sometime thereafter (apparently around 1970), H&M was acquired by Tenneco Corporation and became a subsidiary known as H&M Tenneco.Although P. R. Farms continued to sell the majority of its fruit through H&M Tenneco, P. R. Farms became increasingly dissatisfied with the preferential treatment that it perceived other growers to be receiving from H&M Tenneco. Consequently, in 1972, Pat Sr. decided to look for a local seller through which P. R. Farms' fruit could be sold. At the same time that Pat Sr. initiated his search, G.F.S., a local company which was licensed as a dealer and commission merchant in fruit, was looking for additional lines of fruit to carry.G.F.S. had been *131 formed in 1970 by Anthony Bianco (Bianco) and Angelo G. Papagni (Angelo G.), two local area grape growers. Bianco and Angelo G. were equal shareholders and officers of G.F.S. During its first few years of existence, G.F.S. primarily had sold throughout the United States grapes grown by Bianco and Angelo G. Pat Sr. and Angelo G. were personally acquainted, since P. R. Farms had previously used Angelo G.'s cold storage facilities to temporarily store its fruit. Upon learning that Pat Sr. was dissatisfied with H&M Tenneco, Angelo G. invited Pat Sr. to join G.F.S. Prior to this invitation Angelo G. had approached Pat Sr. with the proposition that G.F.S. act as P. R. Farms' marketing agent. Pat Sr. accepted the offer and in 1973 became a one-third shareholder of G.F.S. along with Bianco and Angelo G. Bianco died in February, 1974, and G.F.S. subsequently redeemed his stock in the corporation from his estate. Pat Sr. and Angelo G. thus became 50 percent shareholders of G.F.S. and remained equal owners of the corporation during the years at issue. Prior to his death in early 1974, Bianco had served as G.F.S's sole salesman. After Bianco died, Angelo G. hired his cousin, Angelo A. Papagni *132 (Angelo A.), to act as salesman for G.F.S.In addition to Angelo A., the only other employee of G.F.S. was its bookkeeper, Robert Ruth. Angelo G. and Pat Sr. were president and vice-president, respectively, of G.F.S. During each of the years 1974, 1975, 1976 and 1977, P. R. Farms and G.F.S. entered into agreements in which G.F.S. agreed to sell P. R. Farms' fruit. The following is the agreement signed by P. R. Farms and G.F.S. for the 1974 crop year and is substantially similar to the agreements entered into in the later years at issue: JUNE 4, 1974 AGENTS AGREEMENT THIS AGREEMENT ENTERED INTO THIS 4th DAY OF JUNE, 1974 BETWEEN THE PARTIES OF P-R FARMS, INC., (HEREAFTER KNOWN AS SELLER) AND GENERAL FRUIT SALES, INC. (HEREAFTER KNOWN AS AGENT) DO HEREIN RECOGNIZE THE SELLING OF PEACHES, NECTARINES, PLUMS AND APRICOTS: WHEREAS, ARE RECEIVED AFTER AUGUST 10, 1974 WHICH ARE TO BE PAID TO THE SELLER AFTER JANUARY 6, 1975 EXPLICITLY OR THEREAFTER. THIS AGREEMENT COVERS THE SALE OF THESE FRUITS FROM THE SELLER THROUGH AGENT FOR THE 1974 SEASON AND MUST BE PAID BY APRIL 30, 1975. IT IS HEREUPON AGREED BY: P-R FARMS, INC./s/ Pat Ricchiuti TITLE President GENERAL FRUIT SALES, INC. /s/ Angelo *133 G. Papagni TITLE President In accordance with the above agreements, less than the full amount of the proceeds received by G.F.S. from the sales of P. R. Farms' fruit was remitted to P. R. Farms in the respective years in which the purchasers paid G.F.S. for the fruit. Rather, as shown on the following chart, G.F.S. paid P. R. Farms a portion of each years' proceeds in the respective subsequent years: Sales Proceeds ofAmount Paid by G.F.S.P. R. Farms Receivedto P. R. Farms inYearby G.F.S.Subsequent Year19743$686,3911975$1,851,150726,49419762,548,862546,76019772,847,811567,106 After he was hired as G.F.S.'s salesman, and during each grape season, Angelo A. worked out of G.F.S.'s office, which was located on Angelo G. 's ranch. During P. R. Farms' harvest period (which did not coincide with the grape season), Angelo A. moved to P. R. Farms' premises in order to remain in close contact with Pat Sr. The pattern of operation was that Pat Sr. would inform Angelo A. which fruit was ripe and thusd available for sale. Angelo A. would then contact potential buyers (each of whom had been initially located *134 by Pat Sr.) and relay the information to them. Angelo A. never negotiated prices with the buyers because he was authorized only to sell the fruit at the current market price. 4 If Angelo A. received a below market bid for any of the fruit, he would consult with Pat Sr., who would alone decide whether to accept the offered price. Pat Sr. handled all complaints (which came primarily in the form of requests for price adjustments) from buyers of P. R. Farms' fruit. He frequently traveled throughout the United States and Canada to meet with buyers and to check the condition of the fruit. If Pat Sr. thought that a buyer was making too many complaints, he would instruct Angelo A. to discontinue selling P. R. Farms' fruit to that buyer. After a sale was made, G.F.S. wouldprepare an invoice along with any related paperwork and bill the buyer. The buyer would subsequently pay G.F.S. for the fruit purchased. Only on Pat Sr.'s specific instructions to G.F.S.'s bookkeeper would those sales proceeds then be remitted in the form of a check to P. R. Farms. Pat Sr., in his capacity *135 as an officer of G.F.S., was responsible for signing G.F.S.'s checks that were sent to P. R. Farms. Because G.F.S. did not immediately remit to P. R. Farms the proceeds it received from the sales of P. R. Farms' fruit, substantial amounts of cash were temporarily left in its possession. G.F.S. earned interest on these funds by purchasing certificates of deposit from banks. Palomate - Cold Storage FacilityIn February, 1970, Palomate was incorporated by Pat Sr. and Frances' four children--Pat Jr., Lorene, Mari Ann and Teri Ann. 5 Twenty thousand shares of common stock at $1.00 par value were issued in equal amounts to each of the children. (Because the three daughters were each minors at the time of incorporation, Pat Sr. and Frances held their stock as custodians. ) Pat Sr., Frances and Pat Jr. were elected president, vice-president and secretary-treasurer of Palomate, respectively, and each were also named directors of the corporation. Palomate was formed to take over P. R. Farms' packing operations. Subsequently, Palomate also engaged in the purchase *136 of farmland. Although P. R. Farms had significantly increased its packing capabilities through the purchase of the Big Six Ranch packing facility, by the time of the 1970 harvest P. R. Farms found itself unable to immediately sell all of its fruit into market channels because it was growing such large quantities of fruit. P. R. Farms was thus forced to store its excess fruit in commercial cold storage facilities located nearby. P. R. Farms became quickly dissatisfied with the service provided by these cold storage facilities because its fruit was not being adequately stored and access to the fruit was hindered by other growers' fruit which was stored in the same warehouses. Consequently, after the 1970 crop season, Pat Sr. (as president of P. R. Farms) undertook an extensive investigation of all the cold storage plants in the area. By the end of the 1971 crop year, Pat Sr. concluded that P. R. Farms would have to build its own cold storage facility. As noted above, Palomate was formed in 1970 in order to relieve P. R. Farms of its packing responsibilities. Shortly after its incorporation, Palomate chose "Alta Sierra" as the name that it would use for its packing label. Pat Jr. *137 accompanied his father on the aforementioned investigation of cold storage facilities. Pat Jr. was knowledgeable in the field of farming as he had had extensive experience withhis father in working on the ranches and also had a B.S. degree in Agri-business from Fresno State College. Palomate was unable to secure the bank financing needed to build a combination cold storage and packing facility that could properly service P. R. Farms' operations. 6 Consequently, in 1973, P. R. Farms purchased 34 acres of unimproved land adjacent to the Big Six Ranch packing facility and subsequently built a packing house and cold storage facility on the site at a cost of approximately $800,000. Packing commenced at this facility for the 1973 crop season (and thus packing at the Big Six facility was discontinued). The cold storage unit was later completed and became ready for use in the 1974 season. During each of the taxable years at issue, P. R. Farms and Palomate entered into a series of agreements which provided that Palomate was to purchase certain fruit grown by P. R. *138 Farms. The fruit purchased by Palomate was to be packed and palletized 7*139 by P. R. Farms prior to sale and payment for the crops was to be made to P. R. Farms in the following year. The agreement shown below was signed for the 1976 crop year and is representative of the agreements entered into during the other years at issue: PALOMATE PACKING CO., INC. 2917 E. SHEPHERD AVE. CLOVIS, CALIFORNIAAugust 15, 1976 AGENTS AGREEMENT THE AGREEMENT ENTERED INTO THIS 15th DAY OF AUGUST 1976, BETWEEN THE PARTIES OF P-R FARMS, INC., (known as seller) AND PALOMATE PACKING CO., INC., (known as the buyer) DO HEREIN RECOGNIZE THE SELLING OF THE 1976 CROP OF FLAMEKIST NECTARINES AND SEPTEMBER GRAND NECTARINES, PACKED AND PALLETIZED. AN AGREEMENT MADE, THAT THESE CROPS BE SOLD AT THE MARKET PRICES OF FLAMEKIST NECTARINES AT $4.00, net per box, F.O.B. CLOVIS, PLANT. THE SEPTEMBER GRAND NECTARINES AT $4.50, net per box, F.O.B. CLOVIS, PLANT. THE PAYMENT TO BE PAID TO THE SELLER, P-R FARMS, INC., AFTER JANUARY 2nd, 1977, EXPLICITLY OR NOT LATER THAN APRIL 1st, 1977. IT IS HEREUPON AGREED BY: /s/ Pat Sr. P-R FARMS, INC./s/ Pat Jr. 8PALOMATE PACKING CO., INC. Frances would supervise the picking of P. R. Farms' fruit when it became ripe and ready for harvest. In addition, Frances was responsible for overseeing the employees who subsequently packed the fruit at P. R. Farms' packing facility. All of the fruit which was grown by P. R. Farms (including that which was sold to Palomate) was packed with the P. R. Farms packing label. Beginning in the 1974 season, after the fruit was packed it was transferred to P. R. Farms' adjacent cold storage facility. Pat Jr. was responsible for operating the cold storage unit and monitored conditions such as temperature and humidity. Moreover, he would keep in close contact with his father regarding the condition of the fruit (i.e., its ripeness) in storage. As noted previously, Pat Sr. would notify Angelo A. when the fruit was ready for sale. Pat Sr. did not, however, distinguish between the fruit which had been sold by P. R. Farms to Palomate and that which P. R. Farms was selling itself. Palomate never incurred *140 and risk of loss on the fruit that it purchased. If damage occurred to the fruit before it was shipped to buyers, P. R. Farms would absorb the loss. During the taxable years at issue, approximately one-third of P. R. Farms' crop production was sold to Palomate under the aforementioned agreements between Palomate and P. R. Farms. Palomate never inquired about purchasing fruit from any grower other than P. R. Farms. In addition, P. R. Farms only sold fruit for resale to Palomate. The fruit Palomate purchased from P. R. Farms was then sold through G.F.S. along with the remaining two-thirds of P. R. Farms' crops.Palomate and G.F.S. signed agreements identical to the "agent agreements" entered into by P. R. Frams and G.F.S. All documents and invoices maintained by G.F.S. for fruit sales made by either P. R. Farms or Palomate show P. R. Farms as the shipper. The proceeds collected by G.F.S. from the sales of Palomate's fruit were remitted to Palomate by G.F.S.'s bookkeeper under Pat Sr.'s direction. During the years at issue, Palomate's office was located on P. R. Farms' premises. P. R. Farms' bookkeeper maintained Palomate's books and records. P. R. Farms paid Pat Jr. a salary of *141 $15,044.08, $10,000.00, $25,000.00 and $35,000.00 in 1974, 1975, 1976 and 1977, respectively. Pat Jr. received no salary from Palomate in 1974, 1975 and 1976 although he was compensated $10,000 in 1977. The following tables summarize the amounts Palomate paid P. R. Farms under the agreements, the revenues received by Palomate from the fruit sold through G.F.S. and the profits made by Palomate from the fruit sales for each of the taxable years at issue: I. PALOMATE CROP PURCHASES FROM P. R. FARMS19741975Date PaidAmountDate PaidAmount1-8-75$171,129.001-5-76$ 67,165.501-15-75200,037.251-30-76264,008.001-22-75217,000.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,230.00Total$671,396.25Total$331,173.5019761977Date PaidAmountDate PaidAmount1-3-77$337,403.751-10-78$119,356.251-4-77110,000.001-31-78134,143.251-12-77141,500.005-12-78112,635.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,000.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,755.75Total$720,659.50Total9 $366,135.25II. PALOMATE CROP SALE REVENUES 19741975Date ReceivedAmountDate ReceivedAmount9-04-74$115,179.1810-10-75$ 21,662.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,518.5710-24-75109,341.1510-03-7460,640.3610-31-7512,689.6010-11-74192,361.3810-31-7579,288.3010-18-74145,057.7111-07-7595,226.3510-25-74144,589.5611-14-7532,198.202-12-75102,591.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,418.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,865.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,745.602-09-763,807.00Total10*142 $803,803.56Total$448,377.5519761977Date ReceivedAmountDate ReceivedAmount9-17-76$ 36,132.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,696.309-30-77$ 9,502.2010-01-7686,702.2510-18-7735,134.9510-08-76107,268.1410-21-7740,075.3010-15-76109,874.3010-28-7769,999.6010-22-76254,985.5711-01-77150,568.2510-29-7697,859.9011-11-77129,242.4011-05-7665,271.8511-18-7735,983.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,367.3312-01-7713,432.5012-09-7710,920.0012-30-771,019.70Total11 $866,158.01Total$495,878.45III. PALOMATE CROP SALE PROFITS YearProfit1974$132,4071975117,2041976145,4981977129,744P. R. Farms - Palomate Loan AgreementIn the fall of 1974, P. R. Farms was experiencing a shortage of working capital and thus needed a short-term loan. Consequently, on September 2, 1974, P. R. Farms' shareholders and directors approved a motion which allowed Pat Sr. "to borrow working capital in the name of [P. R. Farms] from Palomate Packing Company Inc., in the amount not to exceed $550,000.00 and that the loan was to *143 be repaid from crop revenues to be received after Jan. 2, 1975." On that same day, the board of directors of Palomate adopted the following resolution: WHEREAS, it is deemed to be in the best interests of this corporation that it loan the sum of FIVE HUNDRED FIRFTY THOUSAND DOLLARS ($550,000.00) to P. R. FARMS, INCORPORATED, and WHEREAS, the Directors of P. R. FARMS, INCORPORATED, have authorized its Officers to borrow funds from this corporation; RESOLVED: That the Officers of this corporation be, and hereby are, authorized and directed to loan the sum of FIVE HUNDRED FIFTY THOUSAND DOLLARS ($550,000.00) to P. R. FARMS, INCORPORATED, upon terms and conditions in their sole discretion. On its U.S. Corporation Income Tax Return filed for the fiscal year ended January 31, 1975, Palomate reported interest income of $16,810 from the loan to P. R. Farms. P. R. Farms - Palomate Lease AgreementsIn 1971, Pat Jr. began to investigate the possibility of Palomate purchasing farmland. Since Palomate could not afford the equipment that would be necessary to properly farm the land, Pat Jr. thought that Palomate should buy land as an investment and perhaps later develop the land as a residential *144 subdivision. Pat Jr. encountered problems in dealing with prospective sellers due to his youth (he was 24 at the time) and limited experience in purchasing real estate. He thus sought and received the assistance of his father, Pat Sr. Together, they both investigated relatively small parcels of farmland (generally less than 50 acres) that were for sale. Because Palomate would be financially unable to farm any land that it might purchase, Pat Jr. and Pat Sr. agreed that any farmland purchased by Palomate would be leased to P. R. Farms so it could farm the land. Pat Jr. and Pat Sr. thus focused their search on farmland that was available near P. R. Farms and that was suitable for producing crops that were compatible with P. R. Farms' existing crops. Pat Jr. and Pat Sr. were successful in locating various parcels of property that met these requirements. The following chart shows the date of purchase, approximate acreage and the total cost of various properties purchased by Palomate which are referred to as the Palomate Ranches: Palomate Land PurchasesApproximateNameDate PurchasedAcreageCostPalomate Ranch No. 1May 5, 197132 acres$47,000Palomate Ranch No. 2February 1, 197240 acres70,000Palomate Ranch No. 3September 7, 197240 acres66,000Palomate Ranch No. 4February 1, 197443 acres115,000Palomate Ranch No. 5November 5, 197540 acres100,000Concurrently *145 with the above purchases, Palomate entered into written agreements leasing the land purchased to P. R. Farms. During the taxable years at issue, 12 the lease agreements provided as follows: Palomate - P. R. Farms Lease AgreementsRanch No.Date of LeaseLease TermAnnual Rent11/1/742 years$4,00011/1/762 years6,00021/1/742 years7,50021/1/762 years8,00031/1/742 years6,50031/1/762 years9,00041/1/742 years3,50041/1/762 years5,00051/1/762 years4,000P. R. Farms paid Palomate the rent payments as set forth in the lease agreements. P. R. Farms planted fruit trees on each of the properties leased from Palomate. 13 Although many of the new trees bore fruit (which P. R. Farms picked and sold) in their first few years, they did not become commercially productive (i.e., profitable) until approximately their fifth year. P. R. Farms - Pat Jr. Lease AgreementOn January 1, 1972, P. R. Farms and Pat Jr. signed a three-year lease agreement in which P. R. Farms agreed to *146 lease a portion of the Home Ranch to Pat Jr. in exchange for 20 percent of the crops grown and produced on the land. P.R. Farms performed all the work incident to growing the crops on the leased land and received the entire amount of the revenues from the crops produced. P. R. Farms paid Pat Jr. $16,964.50, $24,412 and $22,641 in 1974, 1975 and 1976, respectively, the amounts paid representing 80 percent of the crop revenues. These payments were deducted by P. R. Farms as the cost of fruit purchased from Pat Jr. P. R. Farms - Additional FactsOn P. R. Farms' U.S. Corporation Income Tax Returns filed for the years 1974, 1975, 1976 and 1977, Pat Sr. and Frances are listed as woners of 91.35 percent of P. R. Farms' common stock, except that for 1974 they are shown as owning 91.32 percent of P. R. Farms' stock. During each of these years Pat Sr. was president and a director of P. R. Farms. From the time of its incorporation through 1978, P. R. Farms has never paid a dividend to any of its shareholders. OPINION 1. G.F.S. Deferral AgreementDuring each of the taxable years at issue, P. R. Farms and G.F.S. entered into an "Agents Agreement." The agreement provided that P. R. Farms would *147 sell its fruit through G.F.S. and that G.F.S. would pay P. R. Farms the proceeds from the sales in the subsequent year. G.F.S. revenues from the sales of P. R. Farms' fruit averaged approximately $2,000,000 per year. Contrary to the written agreements, however, the major part of the sales proceeds received by G.F.S. was paid to P. R. Farms in the year in which the crops were sold. The following amounts of proceeds were received by G.F.S. in the year stated and paid to P. R. Farms in the following year: 1974 - $686,391; 1975 - $726,494; 1976 - $546,760; and 1977 - $567,106. The first issue for decision is whether the above proceeds are includable in P. R. Farms' gross income in the taxable year in which G.F.S. received the proceeds or in the subsequent year when G.F.S. remitted the proceeds to P. R. Farms. Respondent contends that because G.F.S. was acting as P. R. Farms' agent in selling its fruit, the deferred payments are includable in P. R. Farms' gross income in the same year that G.F.S. received the proceeds. 14*148 Alternatively, respondent argues that the amounts were constructively received by P. R. Farms in the year that G.F.S. collected the sales proceeds. Petitioner P. R. Farms argues that G.F.S. was not acting as its selling agent and that we should give full recognition to the deferral arrangement between P. R. Farms and G.F.S. For the reasons stated below, we hold that G.F.S. sold P. R. Farms' fruit as its agent and therefore we sustain respondent's determination on this issue. Section 451(a) provides the general rule that "[t]he amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer * * *." Moreover, it is well-settled that the receipt of gross income by an agent constitutes receipt by the principal. Maryland Casualty Co. v. United States,251 U.S. 342, 347 (1920); Joyce v. Commissioner,42 T.C. 628, 639 (1964). Consequently, a taxpayer is required not only to include in gross income all items received by his agent but, in addition, those items must be included in the year in which they are received by the agent. We turn first to California law in order to ascertain whether G.F.S. was acting as P. R. Farms' agent in selling its fruit. Morgan v. Commissioner,309 U.S. 78 (1940). *149 An agent is defined under the California Civil Code as "one who represents another, called the principal, in dealings with third persons." Cal. Civ. Code sec. 2295 (West 1954). The establishment of an agency relationship is predicated on the agent's consenting to act on behalf of the principal, subject to his control. DeSuza v. Andersack,63 Cal. App. 3d 694, 133 Cal. Rptr. 920 (1976); Edwards v. Freeman,34 Cal.2d 589, 212 P.2d 883 (1949). In their written agreement, P. R. Farms and G.F.S. labeled their relationship as one of agency. During each of the taxable years at issue, Pat Sr., as president ofP. R.Farms, and Angelo G., as president of G.F.S., signed a one-page document entitled "Agents Agreement." Throughout the agreement, P. R. Farms and G.F.S. are referred to as seller and agent, respectively. At trial, Pat Sr. Testified that he did not know what the term "agents agreement" meant and that the reason the agreement was designated as such was because he thought it was "a nice word for a letterhead." We consider this explanation disingenuous, however, and are unconvinced by it. Pat Sr.'s claim that he did not know what the term agents agreement meant is puzzling because *150 the prior seller of P. R. Farms' fruit, H&M Tenneco, had also acted as P. R. Farm's agent, a relationship which Pat Sr. fully understood. Moreover, the term "agent" is repeatedly used throughout the agreement and thus was apparently viewed as more than just a nice word for a letterhead. Angelo G.'s testimony provides additional support for our finding that G.F.S. consented to act as P. R. Farms' agent. Angelo G. stated that prior to the taxable years at issue he had approached Pat Sr. with the proposition that G.F.S. act as P. R. Farms' marketing agent. Regarding G.F.S.'s status after the agency agreements at issue were signed, Angelo G. testified that G.F.S. was acting as a broker for P. R. Farms. Angelo G. further noted that a broker is someone who sells for someone else's account as a commission merchant. Although petitioner P. R. Farms disagrees with Angelo G.'s statement that G.F.S. was acting as a broker under the agreements,it agrees that G.F.S. was acting as a commission merchant.The definition of a commission merchant contained in section 56105 of the California Agricultural Code 15 includes any person who handles any farm product as an agent of the producer of the farm *151 product. P. R. Farms concedes on brief that G.F.S. was acting in an agency capacity as P. R. Farms' commission merchant. (As discussed infra, however, P. R. Farms later attempts to qualify this concession). Both respondent and petitioner P. . Farms agree that an agency relationship existed between P. R. Farms and G.F.S. if P. R. Farms exercised effective control over *152 G.F.S., a state of affairs which P. R. Farms asserts did not exist. But the parties' continuing acts demonstrate that P. R. Farms did exercise effective control: Pat Sr. signed G.F.S.'s checks, funds were paid to P. R. Farms at his direction and the contract terms were abided by only when it served the interests of Pat Sr. and G.F.S. Moreover, Pat Sr. (as president of P. R. Farms) exercised a great degree of control over Angelo A., G.F.S.'s sole salesman. During P. R. Farms' harvest season, Angelo A. Worked on P. R. Farms' premises under the direction of Pat Sr. Pat Sr. would inform Angelo A. when a particular variety of fruit was ready for shipment. Angelo A. would then contact a potential buyer from a group that had been selected by Pat Sr. Angelo A. did not negotiate price with these buyers because all fruit was sold at the current market price (which was published daily in the Federal-State Market News Service). If Angelo A. received a below market bid from a buyer, Pat Sr. would decide whether or not to accept the bid. All complaints received from buyers of P. R. Farms' fruit were handled by Pat Sr. He would frequently travel to meet with buyers to personally check on *153 the condition of the fruit sold. In accordance with the written agreements between P. R. Farms and G.F.S., all proceeds from the sales of P. R. Farms' fruit were paid by the buyers to G.F.S. Pat Sr. would later decide when and in what amounts checks representing the sales proceeds of the fruit would be paid by G.F.S. to P. R. Farms. In Warren v. United States,613 F.2d 591 (5th Cir. 1980), the Fifth Circuit Court of Appeals considered the similar issue of whether certain cotton gins were acting as agents of the taxpayer, a cotton grower. In Warren, the cotton gins and the taxpayer had contracted to defer the proceeds from the sales of cotton made by the cotton gin in one year and paid to the taxpayer in the subsequent year. Although the court was not, as here, dealing with the definition of agency under California law, it focused on the degree of control exercised by the taxpayer over the cotton gins. The court held as follows: The relationship between the [taxpayer] and the gins for the purpose of selling the cotton was indisputably that of principal and agent. The [taxpayer] instructed the gins to solicit bids, the [taxpayer] decided whether to accept the highest price offered, *154 and the [taxpayer] determined whether or not to instruct the gins to hold the proceeds from the sale until the following year. The gins' role in the sale of the cotton was to adhere to the [taxpayer's] instructions. The [taxpayer was the owner] of the cotton held for sale; the [taxpayer was] in complete control of its disposition. [613 F.2d at 593.] In the instant case, Pat Sr. (as president of P. R. Farms) exercised complete control over G.F.S. with respect to the sale of P. R. Farms' fruit and the payment of the sales proceeds to P. R. Farms. The degree of control wielded by Pat Sr. at least equaled that which the court of appeals found sufficient to create a principal-agent relationship in Warren. We conclude that the relationship between P. R. Farms and G.F.S. was one of principal and agent, respectively. 16*155 Petitioner P. R. Farms nonetheless argues that deferral arrangements similar to those contained in the agents agreements entered into by P. R. Farms and G.F.S. have been given full recognition by courts in prior cases. In support of its position, P. R. Farms points to the recent decision of the First Circuit Court of Appeals in Reed v. Commissioner,723 F.2d 138 (1st Cir. 1983), revg. a Memorandum Opinion of this Court. In Reed, the taxation of the proceeds of a sale was shifted to a subsequent year through the use of an escrow arrangement with the escrowee acting on behalf of both the buyer and seller. Petitioner's reliance on Reed is misplaced, however, because the court of appeals held that when the escrowee represents both the taxpayer-seller and the buyer, the escrowee does not serve as the taxpayer-seller's agent for income recognition purposes. 723 F.2d at 149. The arrangement before us between P. R. Farms and G.F.S. lacks not only an escrowee, but, in addition, the ultimate buyer of P. R. Farms' fruit. G.F.S. was not the purchaser of P. R. Farms' fruit, but rather was P. R. Farms' agent in making the sales. Consequently, we hold *156 that P. R. Farms must include the proceeds from the sales of its fruit in its gross income in the year in which its agent, G.F.S., received payment from the buyers. 2. G.F.S. - Interest IncomeThe second issue for decision is whether the interest income earned by G.F.S. on the proceeds it retained from the sales of P. R. Farms' fruit is includable in P. R. Farms' gross income. G.F.S. purchased certificates of deposit (C.D.s) with the cash proceeds that it received from the sales of P. R. Farms' fruit. 17 We have held that since G.F.S. was acting as P. R. Farms' agent the receipt by G.F.S. of those sales proceeds constitutes their receipt by P. R. Farms. It follows and we therefore hold that the interest earned from the investment of the proceeds in C.D.s is taxable to P. R. Farms in the years paid by the issuers of the C.D.s. Section 61(a)(4). 3. Palomate Crop PurchasesIn 1974, P. R. Farms completed construction of a combination packing and cold storage facility. In that same year (and in each of three succeeding years) P. R. Farms entered into an agreement with Palomate in which *157 it agreed to sell approximately one-third of its fruit crop to Palomate. All of the fruit grown by P. R. Farms (including that which was sold to Palomate) was stored in P. R. Farms' cold storage facility which was supervised by Pat Jr. Shortly thereafter, the fruit was sold through G.F.S. During the four taxable years at issue, Palomate made profits of $132,407, $117,204, $145,498 and $129,744, respectively, on the fruit it purchased from P. R. Farms. Respondent contends that these profits are taxable to P. R. Farms under the assignment of income doctrine in accordance with Lucas v. Earl,281 U.S. 111, 115(1930) ("* * * no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew."). Alternatively, respondent argues that the profits are taxable to P. R. Farms because P. R. Farms performed all the work relating to the fruit and Palomate was merely a conduit through which P. R. Farms improperly attempted to divert a portion of its profits. Petitioner P. R. Farms argues that Palomate's purchases of its fruit were bona fide. Moreover, P. R. Farms contends that "Palomate made its *158 profit from selling the fruit only because it held the fruit off the market, in cold storage, until scarcity produced higher prices." After careful consideration, we hold that respondent's contention that Palomate was acting as a mere conduit in these transactions is correct. The profits made by Palomate are therefore taxable to P. R. Farms. The conduit theory which respondent relies upon was set forth by the Supreme Court in Commissioner v. Court Holding Co.,324 U.S. 331 (1945). In that case, the Court held that the proceeds from the sale of an apartment building whose sale had been negotiated by the corporation were taxable to the corporation rather than its shareholders despite the fact that the apartment building had been transferred to the shareholders shortly prior to the sale. In reaching its decision, the Court stated that "[a] sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title." 324 U.S. at 334. Although the conduit theory as set forth in Court Holding arose in the corporation - shareholder distribution setting, it has been held to apply in a variety of other factual situations where *159 intermediaries are employed in tax-avoidance transactions. See e.g., Pityo v. Commissioner,70 T.C. 225 (1978) (whether trust was a conduit); Hallowell v. Commissioner,56 T.C. 600 (1971) (whether corporation was a conduit). 18An examination of the relationship between P. R. Farms and Palomate reveals that Palomate was no more than a conduit for P. R. Farms. Palomate was formed in 1970 by Pat Sr. and Frances' four children, each of whom became equal shareholders in the corporation. The corporation was formed for the purpose of entering into the fruit packing business. Concurrently with the formation of Palomate, P. R. Farms' crop production was increasing substantially, to the point where P. R. Farms was unable to immediately sell all of its fruit into market channels. P. R. Farms thus began to temporarily store its surplus crops in local cold storage facilities until the market could absorb the produce. Pat Sr. quickly became dissatisfied with the service P. R. Farms was receiving from these cold storage facilities and determined in 1973 that P. R. Farms needed its own combination cold *160 storage - packing facility. Pat Jr. was quite knowledgeable about the mechanical refrigeration process that was being utilized in the modern cold storage facilities and thus accompanied his father on an exhaustive study of local facilities. Pat Jr. provided much input regarding the type of facility that would best suit P. R. Farms. When the type of cold storage - packing facility that P. R. Farms would need was finally decided upon, it was clear that building such a facility was well beyond the financial capacity of Palomate. P. R. Farms thus decided to build the facility itself at a total cost of $800,000. The facility was completed and ready for use for the 1974 harvest. Beginning in 1974 and throughout the years at issue, P. R. Farms and Palomate entered into agreements 19 in which Palomate agreed to purchase from P. R. Farms a portion of its crop production. Palomate was required under the agreements to pay P. R. Farms for the fruit in the subsequent taxable year. After P. R. Farms' fruit was picked and subsequently packed at its packing facility, it was *161 moved into the adjacent cold storage facility. Pat Jr. was responsible for and supervised all of the fruit which was in cold storage. The fruit was eventually sold (through G.F.S.) and shipped off to buyers. We note that Palomate was formed for the purpose of fruit packing, not fruit storage. When Palomate considered the possibility of entering the fruit storage business, it found itself unable to do so due to the prohibitive cost of building a cold storage facility. Palomate thus stored the fruit it purchased in P. R. Farms' cold storage facility. No rent was paid by Palomate to P. R. Farms for use of this facility, which cost $800,000 to build. Although Pat Jr. (the president of Palomate) supervised the cold storage facility, his services were provided as an employee of P. R. Farms rather than in his capacity as an officer of Palomate, as evidenced by the fact that he was paid an average annual salary of $21,000 by P. R. Farms. Next, we note that Palomate had no control over the sale of the fruit that it purchased. Pat Sr., through his supervision of Angelo A. and based upon information on the condition of the fruit which was provided by Pat Jr., directed which fruit would *162 be sold. No differentiation was made by him between fruit that had been sold to Palomate and that which was still owned by P. R. Farms. Palomate's lack of control over the fruit that it purchased from P. R. Farms is confirmed by the fact that the risk of loss on all of the fruit in cold storage was borne by P. R. Farms. All of the fruit which was sold, including the one-third portion purchased by Palomate, was packed with the P. R. Farms' label. Palomate had chosen a packing label (Alta Sierra) but failed to use it for the fruit that was purchased from P. R. Farms. Finally, G.F.S.'s failure to treat the fruit purchased by Palomate any differently from that of P. R. Farms further supports our finding that Palomate was acting as a conduit for P. R. Farms' sales. All shipping documents and invoices maintained by G.F.S. with respect to sales of fruit grown by P. R. Farms list P. R. Farms as the shipper. Palomate is never mentioned despite the fact that all of the fruit which it purchased from P. R. Farms was sold through G.F.S. As was the case with P. R. Farms, Pat Sr. determined when G.F.S. would send checks for the fruit sale proceeds to Palomate. Accordingly, we hold that P. R. *163 Farms must include in its taxable income the profits made by Palomate on the purchases of its fruit because Palomate was merely a conduit through which P. R. Farms sold a portion of its fruit. 4. Taxable Year of InclusionHaving found that the profits made by Palomate on the fruit it purchased from P. R. Farms are includable in P. R. Farms' gross income, we turn to address respondent's contention that the profits are taxable to P. R. Farms in the year in which G.F.S. received payment for the fruit rather than in the following year when G.F.S. remitted the proceeds to Palomate. Respondent bears the burden of proof on this issue since it was raised by amended answer. Rule 142(a). We find respondent has carried his burden of proof based on our holding, supra, that G.F.S. acted as P. R. Farms' agent in receiving payment for the fruit from buyers. Pat Sr.'s decision to have G.F.S. remit a portion of the fruit sales proceeds to Palomate, a conduit, rather than directly to P. R. Farms is consistent with our prior holding that G.F.S. acted as P. R. Farms' agent. We therefore hold that the net sales proceeds received by Palomate from the sales of P. R. Farms' fruit are taxable to P. R. *164 Farms in the year in which G.F.S. received payment for the fruit. 5. P. R. Farms' "Interest" Payment to PalomateThe next issue for decision is whether P. R. Farms properly deducted on its 1975 income tax return $16,810.00 of interest expense arising from a loan P. R. Farms purportedly received from Palomate. In the fall of 1974, P. R. Farms developed a temporary shortage of working capital due to the agreements it had signed with G.F.S. and Palomate which deferred payment for its 1974 crops until after January 6, 1975. P. R. Farms' directors and shareholders consequently approved a motion on September 2, 1974, which allowed P. R. Farms to borrow up to $550,000,00 from Palomate. The loan was to be repaid from crop revenues received after January 2, 1975. Palomate's directors adopted a resolution on the same day which authorized a loan to P. R. Farms in the amount of $550,000. P. R. Farms subsequently received $550,000 from Palomate. P. R. Farms "repaid" the alleged loan in 1975 by netting the loan amount against the 1974 crop purchases which Palomate owed to P. R. Farms. In addition, P. R. Farms paid Palomate $16,810.00 which was deducted as interest expense on P. R. Farms'*165 1975 income tax return. Respondent argues that P. R. Farms is not entitled to an interest deduction for the $16,810.00 paid to Palomate because there was no bona fide indebtedness and P. R. Farms was in actuality borrowing its own money from Palomate. P. R. Farms contends that the loan was bona fide as evidenced by P. R. Farms' payment to Palomate of the "going rate of interest" on the amount of the funds borrowed. We agree with respondent and hold that P. R. Farms is not entitled to deduct the $16,810.00 as interest expense. We held above that Palomate was a mere conduit through which P. R. Farms funneled one-third of its fruit sales and that P. R. Farms must therefore include in its gross income the net profits made by Palomate. By October 25, 1974, $688,346.76 had been received by Palomate from the sales of P. R. Farms' fruit. 20*166 Since Palomate was a mere conduit for P. R.Farms' fruit sales the revenues it received (through G.F.S.) properly belonged to P. R. Farms. We therefore agree with respondent that P. R. Farms was, in substance, borrowing its own money from Palomate. The fact that P. R. Farms' cash shortage arose from its deferral agreements with G.F.S. and Palomate buttesses our conclusion because, in the absence of those agreements, P. R. Farms would have had in its possession the funds that it allegedly borrowed. Moreover, the failure of P. R. Farms and Palomate to execute a written loan agreement at a stated interest rate demonstrates the lack of any significant substance to the transaction. P. R. Farms nevertheless points to the alleged interest payment made to Palomate as evidence that a bona fide loan existed. We cannot agree that the mere payment of a sum of money designated as interest, without any othe convincing facts, is sufficient evidence that a bona fide loan occurred. Julien v. Commissioner,82 T.C. 492 (1984). P. R. Farms' Interest deduction is therefore denied. 6. P. R. Farms - Palomate Lease Agreements The next issue for decision is whether P. R. Farms is entitled to deduct rental payments made to Palomate. The payments were made by P. R. Farms in accordance with various lease agreements with Palomate which *167 allowed P. R. Farms to farm Palomate land. On most of the land leased from Palomate, P. R. Farms planted fruit treeswhich were expected to become commercially productive (i.e., profitable) within five years. Respondent contends that the rental payments made to Palomate are nondeductible because the leases were for a two-year term while at least five years were necessary for the trees planted by P. R. Farms to become commercially productive. Respondent therefore concludes that there was no economic reality to the payments and, accordingly, they were simply another method by which P. R. Farms diverted income to Palomate. P. R. Farms argues that the payments it made to Palomate constitute bona fide rent and thus are deductible. For the reasons set forth below, we agree with P. R. Farms and hold that the rental payments made to Palomate are deductible. Section 162(a)(3) allows a deduction for "rentals or other payments required to be made as a condition to the continued use or possession * * * of property to which the taxpayer has not taken * * * title * * *." 21 Unlike the deductions provided under section 162(a)(1) for salary and other compensation, the deduction for rentals is not *168 subject to a standard of reasonableness. Imerman v. Commissioner,7 T.C. 1030, 1037 (1946). Nevertheless, ourinquiry in the present case must not focus solely on the question of whether the payments made by P. R. Farms to Palomate were for the continued use or possession of Palomate's property. Rather, because of the close relationship between Palomate and P. R. Farms, we must decide whether the amounts paid by P. R. Farms to Palomate are in excess of what an unrelated lessee would have paid Palomate in an arm's-length transaction. Kansas City Southern Railway Co. v. Commissioner,76 T.C. 1067, 1103 (1981); Place v. Commissioner,17 T.C. 199, 203 (1951), affd. 199 F.2d 373 (6th Cir. 1952); See William E. Davis & Sons, Inc. v. Commissioner,T.C. Memo. 1981-178. We must determine whether what was paid by P. R. Farms to Palomate was "in fact rent [or] something *169 else * * * under the guise of rent." Place,17 T.C. at 203. 22Because respondent first raised the issue of the deductibility of the rent payments by amendment to answer, he bears the burden of proving that the payments made by P. R. Farms to Palomate are excessive and would not have occurred between unrelated parties in an arm's-length transaction. Rule 142(a). Respondent primarily relies on the fact that P. R. Farms signed two-year lease agreements with Palomate while at the same time it planted trees on the leased property which were not expected to become commercially productive for at least five years. Respondentconcludes that unrelated parties would not have entered into a similar agreement in an arm's-length transaction because the lessee has no potential to make a profit from the trees before the two-year lease agreement expires. Petitioner rebuts respondent's position by arguing that P. R. Farms and Palomate intended to renew the lease agreements upon expiration subject only to a possible *170 change in the amount of rent to be charged. We find petitioner's rebuttal to be persuasive. Pat Jr. testified that when Palomate entered the leases with P. R. Farms it was Palomate's intention that they be for a long term. Moreover, he stated that they would be renegotiated in good faith every time that they would come up for renewal. Pat Jr.'s testimony is supported by record. First, we note that prior to the taxable years at issue Palomate had leased Ranches No. 1, No. 2, and No. 3 to P. R. Farms. Each of these leases were renewed. In addition, leases were signed for each of the ranches by Palomate and P. R. Farms for the years subsequent to the years at issue. Second, we note that Pat Sr. spent a significant amount of time aiding Pat Jr. in investigating the properties prior to their purchase and in determining whether P. R. Farms could successfully cultivate the land. We do not think that P. R. Farms would have made the substantial investment that it did in planting the leased land without believing that the leases were going to be renewed. We further observe that if P. R. Farms had not renewed the leases, Palomate was without the means or equipment to harvest the trees *171 planted. We find that respondent has not carried his burden of proving that the lease agreements at issue would not have been entered into by unrelated parties in an arm's-length transaction. We therefore hold that P. R. Farms is entitled to deduct the rental payments made to Palomate. 7.P. R. Farms' Deduction of Cost of Fruit Purchased from Pat Jr. (P. R. Farms - Pat Jr. Lease Agreement)The next issue for decision is whether P. R. Farms is entitled to deduct $16,964.50, $24,412, and $22,641 in 1974, 1975 and 1976, respectively, as the cost of fruit purchased from Pat Jr. The claimed deductions arose under a three-year lease agreement entered into by P. R. Farms and Pat Jr. on January 1, 1972. The agreement provided that P. R. Farms was to lease a portion of the Home Ranch to Pat Jr. in exchange for 20 percent of the crops grown on the land. P. R. Farms received the entire proceeds from the crops which it grew on the leased land. 23 P. R. Farms then paid (and deducted) 80 percent of those proceeds to Pat Jr., thus withholding 20 percent of the crop revenues as rent in accordance with the lease agreement. Respondent *172 argues that P. R. Farms' deduction for the amounts paid to Pat Jr. should be disallowed because P. R. Farms "earned" the income from the crops grown on the "leased" land. P.R. Farms contends that the lease agreement is valid and thus the amounts paid to Pat Jr. are deductible. We disagree with P.R. Farms and hold that the amounts paid to Pat Jr. are not deductible. First, we note that despite the expiration of the lease agreement at the end of 1974, P.R. Farms deducted amounts paid to Pat Jr. in 1975 and 1976. No evidence was offered by P.R. Farms regarding the existence of a lease agreement for either of these two years. Second, and most importantly, P.R. Farms operated the leased portion of the Home Ranch no differently from the rest of its land. P.R. Farms was responsible for planting, picking, packing, selling and shipping all of the fruit which was grown on the land. Moreover, Pat Jr., in his individual capacity, neither possessed the means nor actually participated in the actual farming of the land. In view of these facts, we find the lease agreement to be devoid of substance. We thus conclude that the lease agreement was a futile attempt on the part of P.R. Farms to shift *173 80 percent of the crop proceeds from the leased land to Pat Jr. P.R. Farms' deductions for the amounts paid are therefore disallowed. 24 8. Constructive Dividend to Pat Sr.The next issue for decision is whether Pat Sr. received a constructive dividend from the transactions discussed in issues two through seven, supra. Respondent determined that the net proceeds retained by Palomate from the sales of P.R. Farms' fruit (issue 3), the $16,810 which P.R. Farms paid to Palomate and deducted as interest (issue 5), the rent paid by P.R. Farms to Palomate (issue 6), the amounts paid by P.R. Farms to Pat Jr. and deducted as the cost of fruit purchased (issue 7), and the interest income earned by G.F.S. on the sales proceeds of P.R. Farms' fruit (issue 2) each resulted in a constructive dividend to Pat Sr. We will separately consider each of respondent's determinations after briefly reviewing the conditions necessary for determining whether a constructive dividend occurred. Section 61(a)(7) provides that gross income *174 includes the receipt of dividends.Dividends are defined in section 316(a) as "any distribution of property made by a corporation to its shareholders out of its earnings and profits * * *." In the instant case, we are thus faced with the question of whether any distribution of property was made by P.R. Farms to Pat Sr. out of its earnings and profits. Pat Sr. does not dispute respondent's contention that during the years at issue P.R. Farms had earnings and profits in excess of the total amount asserted as a constructive dividend to him. 25 Neither does he argue that a dividend need be formally declared by a corporation. Loftin and Woodard, Inc. v. United States,577 F.2d 1206, 1214 (5th Cir. 1978); Barbourville Brick Co. v. Commissioner,37 T.C. 7, 13 (1961). Our task then is only *175 to ascertain whether P.R. Farms made a distribution of property to Pat Sr. It is well-settled that expenditures made by a corporation for the personal benefit of a shareholder (rather than in the furtherance of the business interests of the corporation) are constructive dividends to the shareholder in an amount equal to the benefits conferred. Nicholls, North, Buse Co. v. Commissioner,56 T.C. 1225, 1238 (1971). 26 Moreover, corporate expenditures or transfers of funds to a member of the shareholder's family are treated as benefitting the shareholder no less than if the distribution was directly made to the shareholder. Brittingham v. Commissioner,66 T.C. 373, 410 (1976), affd. on another issue 598 F.2d 1375 (5th Cir. 1979); Epstein v. Commissioner,53 T.C. 459, 474 (1969). The rule that a shareholder has received a constructive dividend by virtue of a corporation's expenditures for the benefit of a member of the shareholder's family results from the application of the assignment of income doctrine. See Green v. United States,460 F.2d 412, 419 (5th Cir. 1972). When constructive dividends of this nature are at issue, *176 as in the present case, the courts have inquired whether the shareholder against whom the constructive dividend is being asserted has exercised substantial influence and control over the corporate action which resulted in the claimed dividend. If so, a constructive dividend will result. Green v. United States,supra at 420; Brittingham v. Commissioner,supra at 411. In the case before us, we find that Pat Sr. exercised not merely substantial, but total influence and control over P.R. Farms' activities. Pat Sr. formed P.R. Farms, was president and director of the corporation, and owned (jointly with Frances) over 90 percent of its outstanding stock. In fact, in the voluminous record accompanying this case, we failed to find a single action or decision of P.R. Farms which had not been directed or decided by Pat Sr. Having found that Pat Sr. exercised substantial influence over the activities of P.R. Farms, we now turn to address each of the items which respondent determined were constructive dividends to him. Whether Pat Sr. or members of his family benefitted from the transactions at issue is the controlling question is every instance. a. Net Proceeds Retained by PalomateRespondent *177 first asserts that the net proceeds received and retained by Palomate on the sales of P.R. Farms' fruit constitute a constructive dividend to Pat Sr. In our discussion of that issue we found that Palomate acted as a conduit through which P.R. Farms sold approximately one-third of its fruit. We thus held that the profits made by Palomate on those sales were taxable to P.R. Farms. In support of his determination that the net proceeds retained by Palomate are taxable as a constructive dividend to Pat Sr., respondent argues that Pat Sr. benefitted from P.R. Farms' effective transfer of a portion of the net proceeds from the sales of its fruit to Palomate because Palomate was equally owned by Pat Sr.'s four children. Pat Sr. argues that he received no benefit from the transaction and therefore there was no constructive dividend to him. We agree with respondent. The agreements between P.R. Farms and Palomate which allowed Palomate to retain a portion of the net sales proceeds of P.R. Farms' fruit were signed on behalf of P.R. Farms by Pat Sr. We believe that Pat Sr. initiated the arrangement in order to benefit his children, the owners of Palomate. As discussed above, we need not find *178 that an actual distribution was made to Pat Sr. in order to hold that he received a constructive dividend from the transaction. Green v. United States,supra at 419. Moreover, for the purpose of determining whether a constructive dividend occurred, we find that a significant benefit was conferred upon Pat Sr.'s children throughPalomate's retention of the net proceeds. We therefore hold that the net proceeds retained by Palomate are taxable to Pat Sr. as a constructive dividend. One further note. We held above that P.R. Farms was required to report the sales proceeds received by Palomate from G.F.S. in the year G.F.S. received payment for the fruit. Consequently, the constructive dividends arising from the net sales proceeds retained by Palomate are taxable to Pat Sr. in the year in which the buyers paid G.F.S. for the fruit sold by P.R. Farms through Palomate. b. "Interest" Payment to PalomateRespondent next asserts that the alleged interest payment of $16,810 by P.R. Farms to Palomate is taxable as a constructive dividend to Pat Sr. We agree. We disallowed P.R. Farms' interest deduction of $16,810 because we found that P.R. Farms was in effect borrowing its own money from Palomate. *179 The alleged interest payment made by P.R. Farms to Palomate is in substance equivalent to the transfer of the net sales proceeds discussed above. In both instances, P.R. Farms' funds were routed (albeit along different paths) into the corporate coffers of Palomate in transactions not in the furtherance of P.R. Farms' business interests. We consequently hold that the payment of $16,810 by P.R. Farms to Palomate is taxable as a constructive dividend to Pat Sr. c. Rent Paid by P.R. Farms to PalomateRespondent also determined that the rent paid by P.R. Farms to Palomate is a constructive dividend to Pat Sr. Respondent's determination, however, was based on the assumption that the rent deductions by P.R. Farms would be disallowed. Having found above that the lease agreements and rent deductions by P.R. Farms were bona fide, we hold that the rental payments did not result in a constructive dividend to Pat Sr. d. P.R. Farms' Payments to Pat Jr.Respondent determined that the payments made by P.R. Farms to Pat Jr. which were deducted by P.R. Farms as the cost of fruit purchased are taxable as a constructive dividend to Pat Sr. We have held, supra, that P.R. Farms could not deduct *180 the "cost of fruit purchased from Pat Jr." because P.R. Farms had grown the fruit itself. The payments made by P.R. Farms to Pat Jr. clearly benefitted him without furthering any legitimate business interest of P.R. Farms. We therefore find that Pat Sr. received a constructive dividend from their payment. e. Interest Income Earned by G.F.S.Respondent asserts that the interest income earned by G.F.S. on the proceeds of P.R. Farms' fruit sales which it retained are taxable as a constructive dividend to Pat Sr. We held above that because G.F.S. was acting as P.R. Farms' agent, P.R. Farms must include the interest income in its gross income. Since the record does not reveal that G.F.S. at any time remitted the interest income to P.R. Farms, G.F.S.'s retention of the interest income constituted a contribution of capital to G.F.S. by Pat Sr., the proceeds in effect coming from P.R. Farms, his controlled corporation. The interest income is thus taxable to Pat Sr. as a constructive dividend. 9. Minor IssuesIn addition to the issues discussed above, numerous adjustments determined by respondent and issues raised by amended petition remain for decision in these consolidated cases. Included *181 among these so-called minor issues are items such as the proper substantiation under section 274 of foreign travel expenses, P.R. Farms' entitlement to various deductions, and whether Pat and Frances received dividend income due to P.R. Farms' payment of certain personal expenses. On brief, petitioners rely upon facts not contained in the record, self-serving uncorroborated testimony and insufficient evidence in support of all but one of these issues.Consequently, with the exception of the one issue discussed below, petitioners have not carried their burden of proof.Rule 142(a). The one adjustment which we believe respondent incorrectly determined was the receipt of dividend income by Pat and Frances for each of the years at issue in the amount equal to the fair rental value of their personal residence. Respondent's determination was based on the premise that Pat and Frances had leased their home to P.R. Farms. Although the Home Ranch was leased to P.R. Farms, the Ricchiutis' personal residence was not included in the lease agreement. We therefore hold that Pat and Frances received no dividend income from residing in their home. With respect to the remaining minor issues, however, *182 we hold for respondent due to petitioners' failure to meet their burden of proof on these issues. 10. Addition To Tax For NegligenceThe last issue for decision is whether petitioners Pat and Frances Ricchiuti and P.R. Farms are liable for the addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations. Petitioners bear the burden of proving that the addition to tax is inapplicable. Luman v. Commissioner,79 T.C. 846, 860 (1982); Bixby v. Commissioner,58 T.C. 757, 791 (1972). After carefully considering the entire record, we are convinced that petitioners have carried the burden of proving that their underpayment of tax was not due to negligence or intentional disregard of rules or regulations. The major issues in these consolidated cases, such as the existence of an agency relationship between P.R. Farms and G.F.S. and whether Pat and Frances received constructive dividends, involve relatively complex legal questions from which we believe a good faith misunderstanding of the law occurred. Yelencsics v. Commissioner,74 T.C. 1513 (1980). Moreover, petitioners maintained adequate records, a difficult task in view of the enormous size *183 of their farming operation. 27 Accordingly, we hold petitioners are not liable for the addition to tax under section 6653(a). To reflect the foregoing, Decision will be entered for the respondent in docket No. 799-81.Decisions will be entered under Rule 155 in docket Nos. 5617-78, 5618-78, 12046-81, 12047-81, and 12048-81.Footnotes1. Cases of the following petitioners are consolidated herewith: Pat Ricchiuti and Frances Ricchiuti, docket No. 5618-78; Palomate Packing Company, Inc., docket No. 799-81; P.R. Farms, Inc., docket No. 12046-81; Pat Ricchiuti and Frances Ricchiuti, docket No. 12047-81; and Pat V. Ricchiuti, docket No. 12048-81.↩2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect for the years in question. All Rule references are to the Tax Court Rules of Practice and Procedure.↩3. The record does not show the exact amount of sales proceeds received by G.F.S. for 1974.↩4. Market prices of each of the crops sold by P. R. Farms was published daily by the Federal - State Market New Service.↩5. Pat Jr., Lorene, Mari Ann and Teri Ann combined the first two letters of each of their names to derive the acronym Palomate.↩6. In fact, Palomate could not even have afforded to build a packing facility as large as the then out-dated Big Six facility.↩7. "Palletized" refers to fruit which has already been packed in boxes and placed on wooden pallets for shipping. 8. In 1974, Pat Jr. was elected president of Palomate. He remained president of Palomate during of the taxable years at issue.↩9. Although the parties stipulated that the total purchases for 1977 were $366,135.25, the individual amounts shown as purchased total $366,134.75.↩10. Although the parties stipulated that the total revenues for 1974 were $803,803.56, the individual amounts shown as received total $803,803.64.11. Although the parties stipulated that the total revenues for 1976 were $866,158.01, the individual amounts shown as received total $866,157.74.↩12. Prior to the taxable years at issue, Palomate Ranches No. 1, No. 2 and No. 3 were similarily leased to P. R. Farms.↩13. Some of the properties already contained existing orchards which were either maintained by P. R. Farms or torn out.↩14. Respondent accordingly reduced P. R. Farms' gross income for each subsequent year so the amounts would not be included in gross income twice.15. During the years at issue, Cal. Agric. Code sec. 56105 (West 1968) provided as follows: "Commission merchant" means any person that receives on consignment or solicits from the producer of any farm product such farm product for sale on commission on behalf of such producer, or that accepts any farm product in trust from the producer of such farm product for the purpose of sale, or that sells on commission any farm product, or that handles any farm product in any way for the account of or as an agent of the producer of such farm product. Any person that accepts a farm product from the producer of such farm product for the purpose of sale or resale is a commission merchant, unless he has bought, or agreed to buy, the farm product by contract of purchase and sale, which designates the price to be paid to the producer.↩16. We note that in Arnwine v. Commissioner,76 T.C. 532 (1981), revd. 696 F.2d 1102 (5th Cir. 1983) we found Warren to be factually distinguishable in deciding that an agency relationship did not exist between the taxpayer-seller and a cotton gin. Our decision in Arnwine nevertheless does not preclude us from relying upon Warren when, as in the instant case, the facts are substantially similar to those in Warren.↩17. The record contains no evidence that G.F.S. ever paid over the interest proceeds to P. R. Farms.↩18. See generally, B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 6.2 (1981).↩19. The agreements between Palomate and P. R. Farms are nearly identical to the agreements between P. R. Farms and G.F.S.↩20. Palomate concurrently owed P. R. Farms $671,396.25 for purchases of fruit but under the P. R. Farms - Palomate sale agreement it was not required to pay P. R. Farms for the purchases until after the first of the year.21. Some of the Palomate ranches (none of which are specifically designated in the record) were apparently purchased by Palomate with down payments that were partially borrowed by Palomate from either P. R. Farms or Pat Sr. Respondent does not argue nor do we dispute the fact that Palomate is the owner of the properties leased.↩22. In the instant case, respondent argues that the "something else under the guise of rent" was a constructive dividend to Pat Sr. See our discussion of the constructive dividend issue, infra.↩23. P. R. Farms apparently included these proceeds in its gross income.↩24. The amounts paid by P.R. Farms to Pat Jr. were included by him in his gross income. Respondent has accordingly reduced Pat Jr.'s taxable income by the amounts reported by him.↩25. Although the record contains no specific evidence of P.R. Farms' earnings and profits determined in accordance with section 312, it does reveal that P.R. Farms was quite profitable during the years at issue (its retained earnings of $314,000 on January 1, 1974, increased to $1,195,000 by December 31, 1977). In addition, P.R. Farms had not paid a dividend from the time of its incorporation through 1978.↩26. See also Daniel J. Halpern v. Commissioner,T.C. Memo. 1982-31↩.27. As a matter of fact, respondent appears to have all but abandoned this issue. He makes no mention of it in his opening brief, and devotes only an offhand reference to the issue in a sentence or two in his reply brief.↩